GRANITE PARTNERS, L.P., Granite Corporation and Quartz Hedge Fund, by and through the Litigation Advisory Board of Granite Partners, L.P., Granite Corporation and Quartz Hedge Fund, Plaintiffs,

v.

BEAR, STEARNS & CO. INC., Bear, Stearns Capital Markets Inc., Howard Rubin, Donaldson, Lufkin & Jenrette Securities Corporation, Elizabeth Comerford and Merrill Lynch, Pierce, Fenner & Smith Incorporated, Defendants.

No. 96 CIV 7874(RWS).

United States District Court, S.D. New York.

Jan. 13, 1999.

Friedman Kaplan & Seiler, by Eric Seiler, Robert D. Kaplan, Katherine L. Pringle, of Counsel, New York City, Berlack, Israels & Liberman, by Steven E. Greenbaum, of Counsel, New York City, for Plaintiffs.

Fried, Frank, Harris, Shriver & Jacobson, by David M. Morris, of Counsel, New York City, Bear Stearns & Co. Inc., Bear Stearns Capital Markets Inc. and Howard Rubin.

Morgan, Lewis & Bockius, by Gary G. Staab, Scott S. Balber, Kristine Zaleskas, of Counsel, New York City, for Donaldson, Lufkin & Jenrette Securities Corp.

Brown & Wood, by A. Robert Pietrzak, Andrew W. Stern, Madeleine J. Dowling, of Counsel, New York City, for Merrill Lynch, Pierce, Fenner & Smith Inc.

*OPINION*

SWEET, District Judge.

Defendants Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") (collectively, the "Moving Defendants") have moved pursuant to Rule 37 of the Federal Rules of Civil Procedure to compel plaintiffs Granite Partners, L.P., Granite Corporation, and Quartz Hedge Fund (collectively, the "Funds"), acting by and through their Litigation Advisory Board (the "LAB"), to produce documents obtained and created by the Funds' bankruptcy trustee ("Trustee") and his retained professionals, including notes of witness interviews, valuations and analyses of securities owned by the Funds, and documents collected from third parties. For the reasons set forth below, the motion is granted, and the documents will be produced.

### Prior Proceedings and Facts

After the bankruptcy filing by three hedge funds managed by Askin Capital Management, L.P., the bankruptcy Trustee undertook an investigation to determine the causes of the Funds' losses. During the course of the investigation, the Trustee and his counsel, accountants, and mortgage backed securities experts interviewed witnesses, collected and reviewed documents, and performed various factual, quantitative and legal analyses for the purpose of publishing a report on the causes of the collapse of the Askin-managed funds. The Final Report of Harrison J. Goldin, Trustee (the "Final Report") was issued in April 1996 and was widely distributed and contains quotes from witness interviews, excerpts and descriptions of information from the collected documents, and the results of the Trustee's experts' analysis of the value of the Funds' securities liquidated by the dealers.

The conclusions and analyses contained in the Final Report resulted in settlements with ten broker-dealers and the majority of the Funds' investors, and led to the confirmation of the Third Amended Plan of Liquidation

for the Debtors in March 1997 (the "Plan"). The Plan created the LAB to prosecute, settle, or otherwise resolve any claims or causes of action belonging to the funds. In reliance on the Trustee's fact-finding and analysis, the LAB filed this action on August 4, 1997. Many of the allegations in the First Amended Complaint (and in the five complaints filed by the Funds' investors) are taken directly from the Final Report. The LAB and most of those investors are now in possession of the Trustee's files.

In its responses and objections to DLJ's and Merrill Lynch's requests for production, the LAB objected to all of the requests on the grounds that the documents sought are protected by the work product privilege.

The instant motion was filed on October 7, 1998. Oral arguments were heard on October 21, 1998, at which time the motion was deemed fully submitted.

### The Trustee's Documents Must Be Produced

■ The party seeking to assert a claim of privilege has the burden of demonstrating both that the privilege exists and that it has not been waived. *See von Bulow v. von Bulow,* 811 F.2d 136, 144 (2d Cir.1987); *Smith v. Conway Org.,* 154 F.R.D. 73, 77 (S.D.N.Y.1994); *Nikkal Indus., Ltd. v. Salton, Inc.,* 689 F.Supp. 187, 191 (S.D.N.Y. 1988). This burden stems from the recognition that "enforcement of a claim of privilege acts in derogation of the overriding goals of liberal discovery and adjudication on their merits." *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 473 (S.D.N.Y. 1993). It is for this reason that privileges are "disfavored and generally to be narrowly construed." *Id.; see, e.g., United States v. Goldberger & Dubin, P.C.,* 935 F.2d 501, 504 (2d Cir.1991).

■ The work product doctrine, codified at Federal Rule of Civil Procedure 26(b)(3), shields from discovery "documents and tangible things ... prepared in anticipation of litigation." Fed.R.Civ.P. 26(b)(3). It "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir.1998) (*quoting Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). The doctrine protects a lawyer's ability to prepare his client's case, protects against the disclosure of the attorney's mental impressions, conclusions, strategies, or theories, and also avoids the unfairness that would occur if one party were allowed to appropriate the work of another. *See id.* at 1197.

■ As the Second Circuit held earlier this year, "[w]here a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, it falls within rule 26(b)(3)." *Adlman,* 134 F.3d at 1195. The doctrine extends to notes, memoranda, witness interviews, and other materials, whether they are created by an attorney or by an agent for the attorney. *See United States v. Nobles,* 422 U.S. 225, 238–39, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *Carter v. Cornell Univ.,* 173 F.R.D. 92, 95 (S.D.N.Y.1997); *see also Tribune Co. v. Purcigliotti,* No. 93 Civ. 7222, 1997 WL 10924, at *3 (S.D.N.Y. Jan. 10, 1997) ("Materials produced and information possessed by an agent working for an attorney, such as an investigator or claims adjuster, may be protected as work product, particularly when disclosure of such information would reveal the attorney's thinking and strategy.").

As set forth in full below, the stated objectives of the Trustee's investigation included providing a report "(i) assessing the validity of various creditor claims and (ii) assessing whether the estates have claims against former management, creditors or other persons." According to the LAB, the Trustee and his attorneys conducted their investigation while simultaneously evaluating and developing the claims to be brought by the Funds' estates, and the materials at issue were prepared for the purpose of developing, documenting, and evaluating the factual and legal claims that could ultimately be brought on behalf of the Funds. For this reason, purports the LAB, the documents requested are covered by the work product doctrine.

This motion presents one of the more difficult issues presented in instances of corpo-

rate crisis, whether or not to investigate and if an investigation is warranted, as obviously was the case in this instance, the degree to which the work product privilege can prevent disclosure of fruits of the investigation. The issue in large measure turns upon the use to which the privileged materials are put and whether such use constitutes a waiver of the privileges involved.

The resolution in *In re Kidder, Peabody Securities Litigation*, 168 F.R.D. 459 (S.D.N.Y.1996), is instructive but not precisely on point. There, Kidder Peabody, after discovering trading losses, retained outside counsel to conduct an internal investigation "into what went wrong and to recommend steps to prevent a recurrence." *Id.* at 463. That investigation led to the creation and public dissemination of a report outlining the findings and conclusions reached by outside counsel concerning a scheme involving trades in government securities perpetrated by Joseph Jett, one of Kidder Peabody's traders. Plaintiffs in a shareholder suit against Kidder Peabody sought production of the documents underlying the report. Kidder Peabody sought the protection of the work product doctrine. The court found that Kidder Peabody would have hired outside counsel to perform the investigation even if no litigation had been threatened at the time. *See id.* at 465. The stated purpose of the report was to find out what went wrong and to recommend corrective action— not to prepare for impending litigation. Concluding that a

> detailed and painstaking inquiry was required for pressing business purposes and thus would have been undertaken regardless of whether litigation was threatened ... [and] that the notes and memoranda of the interviews, insofar as they simply recounted witness statements, were created as much for their use in serving Kidder's business needs as for their utility in preparing for litigation,

the court held that Kidder Peabody had not sustained its burden in demonstrating that the documents in question were "prepared 'principally' if not exclusively for litigation purposes." *Id.* at 466. The court did note the following: "it ... bears emphasis that

even if this 'but for' analysis were not the appropriate tool for determining the relative significance of multiple purposes for the creation of a document, the result here would be the same." *Id.* Kidder Peabody was ordered to produce the challenged documents.

Here, the purpose of the Trustee's investigation was to ascertain the reasons behind the Funds' collapse and to report those reasons to the Bankruptcy Court and the public. The Outline of the Scope of the Trustee's Investigation of the Debtors and Proposed Budget ("Outline of Investigation") stated:

> The objective of this investigation is to provide the Bankruptcy Court and the parties with a report describing in detail and explaining the events that precipitated the Funds' filing for bankruptcy. The report will, *inter alia*, facilitate determinations regarding assets and liabilities of the estates, by (i) assessing the validity of various creditor claims and (ii) assessing whether the estates have claims against former management, creditors or other persons.

From the outset, the Trustee intended to make his report public but at the same time contemplated that the Report might also provide grounds for asserting claims against third parties.

Similarly, in *In re Leslie Fay Companies, Inc. Securities Litigation*, 161 F.R.D. 274 (S.D.N.Y.1995), the Leslie Fay board had been informed of certain accounting irregularities with respect to the company's financial statements and commissioned an investigation to determine the cause of the irregularities and who was responsible for them. *See id.* at 277. The investigation and its results were made public in order to relieve concerns expressed by creditors, customers, and shareholders. *See id.* at 281. The *Leslie Fay* court held that "had there been no ongoing or anticipated litigation, Leslie Fay would have conducted an investigation anyway," and the work product privilege was not sustained. *Id.*

The LAB relies upon *U.S. v. Adlman*, 134 F.3d 1194 (2d Cir.1998), to overcome the conclusions reached in *Kidder Peabody* and *Leslie Fay*. In *Adlman*, the Second Circuit, in construing the "in anticipation of litiga-

tion" clause of Rule 26(b)(3), adopted a "because of" existing or expected litigation standard, not a standard of creation "primarily or exclusively to assist" in litigation. *See Adlman*, 134 F.3d at 1198. It may well be said that the effect of *Adlman* is to enforce the work product privilege even if there is a dual purpose for the creation of the materials. However, even if the documents at issue were to fall within *Adlman*'s interpretation of Rule 26(b)(3), that would not end the inquiry. Indeed, the *Adlman* court confirmed that:

> although a finding under this test that a document is prepared because of the prospect of litigation warrants application of Rule 26(b)(3), this does not necessarily mean that the document will be protected against discovery. Rather, it means that a document is eligible for work-product privilege. The district court can then assess whether the party seeking discovery has made an adequate showing of substantial need for the document and an inability to obtain its contents elsewhere without undue hardship.

*Id.* at 1202–03. Furthermore, *Adlman* does not deal with the waiver issue presented here.

■ The controlling issue is whether the Trustee waived any work product privilege that may have shielded from disclosure the documents underlying the Final Report by using those documents in a published report or offensively. Just as the party seeking to assert a claim of privilege bears the burden of establishing the existence of the privilege, that same party has the burden of establishing nonwaiver. *See Nikkal*, 689 F.Supp. at 191. The work product privilege is waived when a party to a lawsuit uses it in an unfair way that is inconsistent with the principles underlying the doctrine of privilege. *See Tribune*, 1997 WL 10924, at *5 (explaining that "[p]rivileges also may be waived when invoked in some fundamentally unfair way"). It is well settled that waiver may be imposed when "the privilege-holder has attempted to use the privilege as both 'sword' and 'shield.'" *In re von Bulow*, 828 F.2d 94, 102 (1987); *see Kidder Peabody*, 168 F.R.D. at 473; *Leslie Fay*, 161 F.R.D. at 282. "[T]he

circuit court [has] held that the scope of any waiver by virtue of disclosure [is] to be defined by the so-called 'fairness doctrine,' which 'aims to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information.'" *Kidder Peabody*, 168 F.R.D. at 469 (quoting *In re von Bulow*, 828 F.2d at 101); *see Bowne*, 150 F.R.D. at 484–85.

There are various ways in which a party may waive its privilege. For instance, an "at issue" or implicit waiver may be found, as discussed below, or a subject-matter waiver may be had. Additionally, if a privileged document is used offensively, the privilege may be waived. Furthermore, waiver may be invoked where "a litigant makes selective use of privileged materials, for example, by releasing only those portions of the material that are favorable to his position, while withholding unfavorable portions." *Tribune*, 1997 WL 10924, at *5; *see also Nobles*, 422 U.S. at 239–40, 95 S.Ct. 2160.

Indeed, courts have recognized that the work product privilege is waived when a party places otherwise protected work product "at issue." In *Bowne*, defendant AmBase asserted counterclaims against plaintiff Bowne regarding the cause for delay in the mailing of a proxy statement. *See Bowne*, 150 F.R.D. at 469. The court found that counsel for AmBase possessed documents that shed light on the issue of knowledge as to which party was at fault for the "missed mailing." *Id.* at 487. The court ordered production of documents on which AmBase claimed work product protection because those documents were placed "at issue." *Id.* at 488. The court concluded it could be found that AmBase waived its work product privilege because "invasion of the privilege [was] required to determine the validity of [AmBase's] claim ...." *Id.* at 488 (internal quotations omitted); *see, e.g., Coleco Indus., Inc. v. Universal City Studios, Inc.*, 110 F.R.D. 688, 689–91 (S.D.N.Y.1986) (holding that defendant that raised reliance upon advice of counsel as a defense in suit concerning trademark and copyright ownership rights placed documents containing legal the-

ories, opinions, and conclusions prepared by counsel at issue, thus waiving the work product privilege).

 A privilege may be impliedly waived where a party makes assertions in the litigation or "asserts a claim that in fairness requires examination of protected communications." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991). Waiver typically occurs when the party asserting the privilege placed a protected document in issue through some affirmative act intended to insure to that party's benefit or where the party makes selective use of the privileged materials. *See generally Tribune*, 1997 WL 10924, at \*5–\*6. In this Circuit, the factors often applied to determine whether there has been an implied or "at issue" waiver are set out in *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975), and are as follows:

> (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus, there were three conditions exist, a court should find that the party asserting a privilege waived it through his own affirmative conduct.

*Id.* at 581, cited with approval in *Bilzerian*, 926 F.2d at 1292; *see Kidder Peabody*, 168 F.R.D. at 470; *Bowne*, 150 F.R.D. at 488–89; *see also Tribune*, 1997 WL 10924, at \*6 (rejecting plaintiffs' contention that the "at issue" waiver doctrine only applies to attorney-client privilege, and not to work product and proclaiming that "this distinction [is not] meaningful").

 Here, the Final Report quoted from the interview notes sought by this motion and based its conclusions regarding the Funds' claims for commercially unreasonable liquidation on "benchmark" prices created by the Trustee's expert, Gifford Fong ("Fong"). The Final Report also appends a selection of the thousands of pages of documents collected by the Trustee and his professionals. The use of selected quotes from the Trustee's interview notes waives any privilege claimed on the unquoted portions of those notes. During numerous depositions, counsel for the LAB used the Trustee's notes and memoranda to cross-examine DLJ and Merrill Lynch witnesses regarding their interviews with the Trustee. Interview notes were used to impeach witnesses as to facts they may have known four years ago but have since forgotten. Additionally, the inclusion of Fong's findings in the published report placed the accuracy of his data and the validity of his analyses at issue and, thus, waives privilege on the supporting documents. Those documents and others relied upon in the Final Report concern most of the allegations in this case and in the investors' suits.

 In response to the Moving Defendants' contention that the LAB has waived any work product that attached to the Trustee's interview notes by using them offensively, the LAB asserts that no waiver occurred because its counsel did not "introduce any notes." However, the issue of waiver rests not on whether a privileged document is introduced into evidence, but rather whether the party's use of the document is unfair and inconsistent with a claim of privilege. *See e.g., Worthington v. Endee*, 177 F.R.D. 113, 116 (N.D.N.Y.1998) (holding that "[w]here a litigant asserts a claim that in fairness requires examination of a privileged communication, courts have held the protections of the attorney-client privilege and the work product doctrine implicitly waived"); *see also Bilzerian*, 926 F.2d at 1291; *Tribune*, 1997 WL 10924, at \*5. In the case at bar, the unfairness arises out of the LAB's possible use of allegedly privileged interview notes to impeach witnesses by reference to testimony they gave more than four years ago.

Finally, pursuant to Rule 26(b)(3), to the extent that the documents come under the umbrella of work product, they may be subject to discovery "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). The Moving Defendants have made such a showing. The interview notes and financial analyses on

which the Trustee relied in producing the Final Report are essential to DLJ's and Merrill Lynch's defense.

■ DLJ and Merrill Lynch have substantial need for the Trustee's interview notes even though counsel for the Moving Defendants were also present during the interviews of their respective employees. Moreover, the Trustee conducted dozens of witness interviews to which the Moving Defendants were neither invited nor admitted. Regardless, the interviews were conducted with the threat of compulsory process during the months immediately following the events at issue in this case, when the witnesses' memories were fresh. Depositions conducted four years later cannot reveal the same detail and may omit exculpatory evidence contained only in the Trustee's interview notes. Moreover, the Final Report contains selective quotes from many of the interviews conducted by the Trustee. The Moving Defendants need to review the portions of those interviews that were omitted from the Final Report to place the quoted portions in context.

■ Furthermore, the analyses performed by the Trustee's experts allegedly provide the underlying factual basis for the LAB's primary claim against the defendant broker-dealers—that the Funds' securities were liquidated at commercially unreasonable prices, substantially below market value. Those allegations are predicated upon the Trustees's claim that the securities prices credited to the Funds by the dealers deviated from "benchmark prices" created by the Trustee's professionals. Without access to the data and analyses used by the Trustee's experts, no expert retained by the Moving Defendants will be able to reconstruct the methodology used and assumptions made by Fong in creating the "benchmark" prices which form the basis for the claims for commercially unreasonable liquidation asserted in the Final Report and in the Amended Complaint. Defendants have no alternative means to obtain the information underlying the claims of unfair pricing. DLJ and Merrill Lynch have a substantial need for Fong's work product in order to understand and potentially challenge his conclusions.

As the court held in *Bristol–Myers Squibb Co. v. Rhone–Poulenc Rorer*, No. 95 Civ. 8833, 1997 WL 801454, at *1 (S.D.N.Y. Dec. 31, 1997), waiver, "of either the lawyer-client or work product privilege, is designed to assure fairness to litigants." Here, the Trustee and the LAB have waived any privilege that may have attached to the Trustee's documents by putting the Trustee's conclusions at issue through the publication of the Final Report and using the Trustee's documents offensively. Also, any work product privilege is overcome by defendants' substantial need for the requested materials.

An assessment of the purpose for which the privileged documents were created, the reliance upon the documents for the preparation and publication of the Report, the irreplaceability of certain of the documents and the consequent need for the documents to prepare an adequate defense, and the overall purpose of discovery requires the production of the documents as to which the work product privilege is asserted.

### Conclusion

For the reasons set forth above, the Moving Defendants' motion to compel production of the Trustee's documents is granted.

It is so ordered.